# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re Qudian Inc. Securities Litigation

Master File No. 1:17-cv-09741-RA

**CLASS ACTION**

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Lead Plaintiffs Alan B. Hertz and the Alan Hertz Family2012 Trust and additional plaintiff Darwin Sutanto (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public statements and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Qudian Inc. ("Qudian" or the "Company"), securities analysts' reports, news stories, witness interviews, and the review of other publicly available information. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a securities class action on behalf of all persons other than Defendants and their affiliates who purchased Qudian American Depositary Shares ("ADSs") in or traceable to

the Company's October 18, 2017 initial public offering (the "IPO"), seeking to recover damages caused by Defendants' violations of the strict liability provisions of Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Qudian's IPO offered for sale to investors 37,500,000 ADSs at $24 per ADS; 35,625,000 sold by the company and 1,875,000 sold by certain selling shareholders affiliated with the company.  In addition, the selling shareholders made available to the underwriters of the IPO an additional 5,625,000 ADSs to cover any over-allotment of the IPO.  The over-allotment option was fully exercised.  In total, 43,125,000 ADSs were sold to investors.  At $24 per ADS, $1.035 billion was raised from investors, including the over-allotment.  The IPO was the fourth largest in the United States in 2017.

3.      Defendant Qudian, founded in 2014, is a Cayman Islands company based in Beijing, China, that owns operating companies that provide online small consumer credit products in the People's Republic of China. The Company offers online cash short-term unsecured credit products (cash loans) and online merchandise credit products (installment loans).

4.      The registration statement and prospectus (both defined below in paragraph 66) issued to investors in connection with the IPO (collectively, the "Registration Statement") contained false and misleading statements of material fact and omitted material facts about Qudian's business and practices.

5.      First, the Registration Statement falsely stated that the Company exited its business of making loans to college students in November 2015 and that the Company would reject an applicant's loan application if the applicant was a student.  This was material, *inter alia*, because college student lending had been Qudian's main business and the Chinese government

had prohibited such lending to college students in April and June of 2017.  Qudian nevertheless continued to actively operate and promote its business of lending to college students up to the IPO and continued these illegal practices even after the IPO.

6.      Second, the Registration Statement assured investors that the Company did not employ illegal or even aggressive collection practices for overdue loans and instead strictly complied with applicable laws governing loan collections.  In truth, however, Defendants not only aggressively collected overdue loans, but they also employed illegal and unethical means in violation of Chinese laws and regulations, such as threatening students and calling their teachers, parents or spouses to exert pressure on the borrowers.  A former company employee reported that the methods used were so humiliating to young vulnerable students that at least one committed suicide.

7.      Third, although Chinese laws have limited the all-in annual interest rate for private loans to no higher than 36% and additional annual overdue interest rates to no higher than 24% since 2015, the Registration Statement failed to disclose that the Company had charged or attempted to charge overdue borrowers a *daily* interest rate as high as 5% as "penalties" for overdue loans, which, on an annualized basis is 1,825%, *i.e.*, 76 times higher than allowed under the Chinese law.

8.      Finally, the Registration Statement failed to disclose that a significant number of student borrowers' highly confidential personal information was downloaded by Qudian employees and sold on the black market before the IPO, as a result of the Company's lax security measures and lack of adequate internal controls over borrower data. Controls were so lax that many employees could freely download clients' data and use such information for unauthorized purposes. Chinese authorities arrested and convicted at least one individual for fraud after he

illegally obtained Qudian's customer information and used that information in 2016 and 2017 to defraud those customers. Yet, the Registration Statement failed to disclose the data breaches and lax data security, instead touting the Company's security measures.

9.      Defendants' materially false and misleading statements and omissions allowed Defendants to pocket $1.035 billion via the IPO. Following the IPO, the market learned the truth about the Company.  As a result, within weeks of the IPO, Qudian's ADS price collapsed; dropping nearly 50% from the IPO price of $24, and wiping out hundreds of millions of dollars in investors' money.

## II.      JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 22 of the Securities Act (15 U.S.C. § 77v).

12.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b) because certain of the acts and conduct complained of herein, such as the trading of the ADSs on the New York Stock Exchange ("NYSE"), occurred in this District.

13.     In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

### III.   PARTIES

14.     Lead Plaintiffs purchased Qudian ADSs pursuant and/or traceable to the IPO and were damaged thereby.  Lead Plaintiffs' PSLRA certifications were previously filed with the Court and are incorporated by reference herein.  *See* ECF No. 64-2.

15.     Plaintiff Darwin Sutanto purchased Qudian ADSs pursuant and/or traceable to the IPO and was damaged thereby.  Mr. Sutanto's PSLRA certification is being filed as an exhibit to this pleading.

16.     Defendant Qudian is a Cayman Islands company based in Beijing, China, with its principal executive offices located at Lvge Industrial Building – 15th Floor, 1 Datun Road, Beijing F4 100012, People's Republic of China.  The Qudian ADSs that were sold in the IPO trade on the New York Stock Exchange ("NYSE") under the ticker symbol "QD."

17.     Defendant Min Luo ("Luo") is Qudian's founder, and was Qudian's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at the time of the IPO.  Defendant Luo was also the controlling shareholder of the Company before and after the IPO by way of his ownership of Qudian Class B shares.

18.     Defendant Carl Yeung ("Yeung") was Qudian's Chief Financial Officer ("CFO") at the time of the IPO.

19.     Defendant Lianzhu Lv ("Lv") was a member of Qudian's Board of Directors at the time of the IPO.

20.     Defendant Yi Cao ("Cao") was and member of Qudian's Board of Directors at the time of the IPO.  Through an entity he controls, Cao sold 606,782 Class A ordinary shares represented by ADSs in the IPO.

21.     Defendant Shilei Li ("S. Li") was a member of Qudian's Board of Directors at the time of the IPO.

22.     Defendant Li Du ("Du") was a member of Qudian's Board of Directors at the time of the IPO. Through entities he controls, Du sold 606,782 Class A ordinary shares represented by ADSs through the IPO.

23.     Defendant Chao Zhu ("C. Zhu") was a member of Qudian's Board of Directors at the time of the IPO.

24.     Defendant Tianyu Zhu ("T. Zhu") was a member of Qudian's Board of Directors until September 2017.   Through entities he controls, T. Zhu sold 215,519 Class A ordinary shares represented by ADSs in the IPO.

25.     Defendant Diana Arias ("Arias") signed the Registration Statement as the authorized representative in the United States for Qudian at the time of the IPO.

26.     Defendant Yifan Li ("Y. Li") was a member of Qudian's Board of Directors as of October 17, 2017,

27.     Defendant Rocky Ta-Chen Lee ("Lee) was a member of Qudian's Board of Directors as of October 17, 2017.

28.     Defendant Yahui Zhou ("Zhou"), was a member of Qudian's Board of Directors from February 2016 to February 2017.   Through entities he controls, Zhou sold 588,225 Class A ordinary shares represented by ADSs in the IPO.

29.     The defendants identified in ¶¶17-28 are referred to herein as the "Individual Defendants."

30.     The Individual Defendants, other than Zhou and T. Zhu, signed the Registration Statement.

31.     The senior management of Qudian, including defendants CEO Luo and CFO Yeung, as executive officers and authorized representatives of Qudian, participated in the solicitation and sale of Qudian ADSs to investors in the IPO, motivated in part to serve their own financial interests and the interests of Qudian.  Luo, Yeung and other members of Qudian senior management attended IPO road shows conducted by the Underwriters in an effort to persuade investors to purchase Qudian stock in the IPO.  During the week of October 2 through 6, 2017, Luo, Yeung and other Qudian senior management attended IPO road shows for investors in Asia and Europe.  Luo, Yeung and other Qudian senior managers then continued IPO road shows in the  United States during the week of October 9 through 17, 2017.  Defendant CEO Luo stated in an interview on October 22, 2017 (hereinafter, the "October 22 Interview")[1] that five people on the Qudian management team attended the roadshows in the U.S.[2] to promote Qudian stock, including Defendant Luo, the Chief Capital Officer, and the Investor Relations Manager. Defendant Luo stated at a press conference in January 2018 that he was thrilled when he attended the roadshows because "we raised $1.035 billion U.S. dollars and we got over-allotment. This means that investors approve us very much."[3]  The purpose of senior management's participation in the road shows was to solicit investors for the IPO to help sell Qudian shares in the IPO.  A successful IPO would increase the value of Luo's 63,491,172 Qudian shares by creating a liquid market.  Moreover, as the CEO and CFO of Qudian their job was to ensure a successful IPO and making the road shows successful was their mandate in that regard.  Defendant CFO Yeung also

---

[1] "Min Luo of Qudian Responds to Everything," October 22, 2017, https://mp.weixin.qq.com/s/ffFIDiGSaywB9ZZ9SeqDig

[2] Per a Bloomberg report on October 10, 2013, road shows would be held in New York, Boston, San Francisco and Chicago.

[3] http://www.cyzone.cn/a/20180116/322222.html

gave a live interview on television at the NYSE the morning of the IPO to drum up investor interest in the IPO.

32.     Defendant Qufenqi Holding Limited ("Qufenqi") is a British Virgin Islands limited liability company located at Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands.  Qufenqi held all of Qudian's Class B ordinary shares after the IPO.  Qufenqi is indirectly wholly owned by a trust established for the benefit of defendant Luo and his wife.  Through Qufenqi and its Class B shares, Luo beneficially owned a majority of Qudian's voting shares and controlled the Company before, during and after the IPO.

33.     Defendant Phoenix Auspicious FinTech Investment L.P. ("Phoenix") is a Cayman Islands limited partnership located at P.O. Box 2075, #31 The Strand, 46 Canal Point Drive, Grand Cayman KY1-1105, Cayman Islands.  Phoenix's general partner is Phoenix Wealth (Cayman) Asset Management Limited, an exempted company incorporated under the laws of the Cayman Islands, and is controlled by Defendant Du.  Phoenix sold 606,782 Class A ordinary shares represented by ADSs sold in the IPO, together with defendant Wa Sung (defined below), for the benefit of Defendant Du.

34.     Defendant Wa Sung Investment Limited ("Wa Sung") is a Hong Kong limited liability company located at Unit 606, 6th Floor, Alliance Building, 133 Connaught Road Central, Hong Kong, and a subsidiary of Guosheng Financial Holding Inc., a public company listed on the Shenzhen Stock Exchange, and over which Defendant Du had control at the time of the IPO.  Wa Sung sold 606,782 Class A ordinary shares represented by ADSs sold in the IPO, together with Defendant Phoenix, for the benefit of defendant Du.

35.     Defendant Source Code Accelerate L.P. ("Source Code") is a Cayman Islands limited partnership located at Harney's Services (Cayman) Limited, 4th Floor, Harbour Place,

103 South Church Street, George Town, P.O. Box 10240, Grand Cayman KY1-1002, Cayman Islands. Source Code's general partner is Source Code Investment Mercury Co., which is indirectly controlled by defendant Cao. Source Code sold 606,782 Class A ordinary shares represented by ADSs sold in the IPO for the benefit of defendant Cao.

36.     Defendant Kunlun Group Limited ("Kunlun"), a Hong Kong limited liability company located at Unit 204, 2/F, Malaysia Building, 50 Gloucester Road, Wanchai, Hong Kong, is wholly owned by Beijing Kunlun Tech Co., Ltd., a public company listed on the Shenzhen Stock Exchange. Defendant Zhou is the general manager and chairman of the board of directors of Beijing Kunlun Tech Co., Ltd.. Kunlun sold 588,225 Class A ordinary shares represented by ADSs in the IPO for the benefit of defendant Zhou.

37.     Defendant Ever Bliss Fund, L.P. ("Ever Bliss") is a Cayman Islands limited partnership located at Office of Sertus Incorporations (Cayman) Limited, Sertus Chambers, Governors Square, Suite #5-204, 23 Lime Tree Bay Avenue, P.O. Box 2547, Grand Cayman, KY1-1104, Cayman Islands, and controlled by defendant T. Zhu. Ever Bliss sold 215,591 Class A ordinary shares represented by ADSs sold in the IPO, together with defendant Joyful Bliss Limited, for the benefit of defendant T. Zhu.

38.     Defendant Joyful Bliss Limited ("Joyful Bliss") is a Hong Kong limited liability company located at RM 1501, 15/F SPA CTR 53-55, Lockhart Road, Wanchai, Hong Kong, and controlled by defendant T. Zhu. Joyful Bliss sold 215,591 Class A ordinary shares represented by ADSs sold in the IPO, together with defendant Ever Bliss, for the benefit of defendant T. Zhu.

39.     The defendants identified in ¶¶32-38 are referred to herein as the "Selling Shareholder Entity Defendants."

40.     Defendant Morgan Stanley & Co. International plc ("Morgan Stanley") served as an underwriter for the IPO and sold 14,252,850 ADSs for which it received certain fees and commissions.  Morgan Stanley has offices located at 1585 Broadway, New York, New York, 10036.

41.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the IPO and sold 5,616,890 ADSs for which it received certain fees and commissions.   Credit Suisse has offices located at 11 Madison Avenue, New York, New York, 10010.

42.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the IPO and sold 4,914,778 ADSs for which it received certain fees and commissions. Citigroup has offices located at 388 Greenwich Street, New York, New York 10013.

43.     Defendant China International Capital Corporation Hong Kong Securities Limited ("China International") served as an underwriter for the IPO and sold 6,108,365 ADSs for which it received certain fees and commissions.  China International has offices located at 29/F, One International Finance Centre, 1 Harbour View Street, Central, Hong Kong.

44.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the IPO and sold 4,212,670 ADSs for which it received certain fees and commissions.  UBS has offices located at 1285 Avenue of the Americas, New York, New York 10019.

45.     Defendant Stifel, Nicolaus and Company, Incorporated ("Stifel") served as an underwriter for the IPO and sold 819,148 ADSs for which it received certain fees and commissions.  Stifel has offices located at One Montgomery Street, 37th Floor, San Francisco, California 94104.

46.     Defendant Needham & Company, LLC ("Needham") served as an underwriter for the IPO and sold 945,187 ADSs for which it received certain fees and commissions.  Needham has offices located at 250 Park Avenue, New York, NY 1017.

47.     Defendant Nomura Securities International, Inc. ("Nomura") served as an underwriter for the IPO and sold 630,112 ADSs for which it received certain fees and commissions.  Nomura has offices located at Worldwide Plaza, 309 West 49th Street, New York, NY 10019-7316.

48.     The defendants identified in ¶¶40-47 are referred to herein as the "Underwriter Defendants."

49.     Qudian, the Individual Defendants, the Selling Shareholder Entity Defendants, and the Underwriter Defendants are collectively referred to hereinafter as "Defendants."

50.     The Underwriter Defendants participated in drafting the Registration Statement, caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO, and participated in the dissemination of the Registration Statement. However, the Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters for the Offering and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, free of misstatements or omissions.

51.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable but incorrect and/or misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

52.     Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the IPO. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their due diligence, the Underwriter Defendants had access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

53.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the Offering; (2) the terms of the Offering, including the price at which the Company's ADSs would be sold; (3) the language to be used in the Registration Statement; (4) what disclosures about the Company would be made in the Registration Statement; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants were, at a minimum, negligent in allowing dissemination of the material misstatements and omissions contained in the Registration Statement as detailed herein.

54.     The Underwriter Defendants' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

## IV.     WITNESSES

55.     Plaintiffs' investigators spoke with former employees ("FE") of Qudian who have personal knowledge of the facts alleged in this Complaint:

56.     FE1 worked at Qudian Group from May 2015 to April 2018 and was a supervisor in Qudian's collections department.

57.     FE2 worked for Qudian principal operating subsidiary Beijing Happy Time Technology Development Co., Ltd. ("Beijing Happy Time") as a regional manager in Guangzhou, Guangdong Province from May 2016 to December 2017. He was mainly responsible for recruiting salespersons, marketing promotion, and checking the qualifications of student borrowers in the region of Guangzhou.

58.     FE3 worked as a collections specialist summer intern at Tianjin Branch of Beijing Happy Time from June 2016 to September 2016.  She was responsible for making telephone calls to "remind" student borrowers who failed to repay Qudian's loans on time to repay their loans.

59.     FE4 was a former city manager of Qudian Group from July 2014 to June 2016. He was responsible for promoting Qudian's business and developed the market in such cities as Liaocheng, Tai'an, Dezhou and Heze.[4]  FE4 states that Qudian Group had 15 full-time and about 100 part-time employees in the four cities mentioned above in 2016.  FE4 said that throughout his term of employment, Qudian's standard collection methods included contacting the student borrowers' teachers and parents and even going to their dormitories and threatening the students.

60.     FE5 worked successively as a part-time loan marketer, business developer, and risk controller at Beijing Happy Time in Tianjin from 2013 to July 2017. He was mainly

---

[4]   These are mid-size cities in China with populations of 5.97 million, 5.49 million, 5.58 million, and 8.28 million, respectively.

responsible for chasing student borrowers with overdue loans to convince them to repay the loans as soon as possible.

61.     FE6 was a risk controller at Beijing Happy Time from August 2016 to October 2017 in Tianjin, mainly responsible for collecting loans that were overdue by less than 50 days.

62.     FE7 worked at Qudian from August 2014 to March 2018. He first was a loan collector at Qudian's Tianjin operations center.  In 2017, he helped establish Qudian's Fuzhou Operation Center, helping set up Qudian's loan collection system and processes for collecting loans that are overdue by one to four months.

63.     FE8 was a former regional manager of Qudian Group in Jiangsu Province from December 2013 to November 2014, where his responsibilities included managing a sales team of about 60 employees in 2014.

64.     FE9 was a risk control manager of Qudian Group from March 2014 to April 2017. He oversaw Qudian Group's credit auditing department and collection department in the Beijing headquarters.  FE9 states that the credit auditing department in Beijing managed all of the credit auditing affairs of Qudian Group's clients.

65.     FE10 was employed by Qudian as a business development manager in Yan'an from February 2015 to June 2016.

## V.      MATERIALLY FALSE AND MISLEADING STATEMENTS

66.     On or about September 18, 2017, Qudian filed with the SEC its registration statement on Form F-1 (Registration No. 333-220511), which would later be utilized in the IPO following multiple amendments on Form F-1/A, the last of which was filed on October 13, 2017 and declared effective by the SEC on October 17, 2017 (the Form F-1, together with all amendments, is referred to herein as the "registration statement"). On October 17, 2017, the

Defendants priced the IPO at $24 per share. Then, on or about October 18, 2017, Qudian filed the final prospectus for the IPO ("Prospectus"), which forms part of the registration statement (the Prospectus and registration statement are collectively referred to herein as the "Registration Statement"). That same day, Qudian stock began trading on the NYSE under the ticker symbol "QD."

67. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

68. The Registration Statement stated that Qudian had experienced rapid growth in revenues, net income and active users in the years leading up to the IPO, but failed to disclose that this growth had been fueled by improper lending, underwriting, and collection practices.

69. The Registration Statement stated that the Company no longer provided online loans to college students and that Qudian had "***terminated*** [its] initial business of facilitating credit to college students on campuses across China" and instead had "shifted [its] focus to a broader base of young consumers in China starting from November 2015." The Registration Statement also stated that this shift was a primary driver of the Company's recent revenue and active borrower growth.

70. In reality, the Company continued to market and lend to college students long after November 2015. Former employees corroborate that lending to students remained a significant part of Qudian's business until at least December 2017, after the filing of the Registration Statement. As confirmed by FE2, the Company's marketing teams directly targeted college campuses until at least December 2017, providing installment loans to student borrowers

for the purchase of computers, cell phones, cameras and luxury goods.

71.     The Registration Statement also claimed that the Company employed user-friendly and non-threatening debt collection methods that complied with applicable laws and regulations.  It stated that Qudian and its employees "aim to ensure our collection efforts comply with the relevant laws and regulations in the [People's Republic of China] and we have established strict internal policies that our collections personnel do not engage in aggressive practices."  It  also stated: "We have implemented payment and collection policies and practices designed to optimize regulatory compliant repayment, while also providing superior borrower experience … "

72.     Such statements were false because the Company routinely engaged in illegal and aggressive collection tactics that went far beyond the non-threatening methods highlighted in the Registration Statement.  As disclosed by multiple witnesses, Qudian collection teams would employ harsh methods against borrowers with overdue loans, including verbal abuse and attacks, threatening messages, and contacting the borrowers' classmates, teachers, and parents in an effort to embarrass and humiliate them.  A former Qudian employee reported that some of the attacks and threats were so humiliating that a borrower committed suicide.

73.     Further, the Registration Statement stated:

- "[o]ur online small credit companies are required by the applicable laws to comply with the 36% limit on annualized interest rate set forth in the Private Lending Judicial Interpretations."

- "In an effort to comply with potentially applicable laws and regulations, we adjusted the pricing of all our credit products in April 2017 to ensure

that the annualized fee rates charged on all credit drawdowns do not exceed 36%."

74.     Such statements were materially misleading because as stated above, Qudian had charged or attempted to charge borrowers as high as a 5% daily overdue penalty interest rate, *i.e.*, a 1,825% annualized interest rate, 76 times higher than the maximum 24% penalty rate allowed under the Chinese law.

75.     Further, the Registration Statement stated that "[i]n providing our online consumer finance service, we collect certain personal information from borrowers, and also need to share the information with our business partners such as institutional funding partners for the purpose of facilitating credit to borrowers.  We have obtained consent from borrowers to collect and use their personal information, and have also established information security systems to protect the user information and to abide by other network security requirements under such laws and regulations."

76.     The Registration Statement further claimed that "Our network is configured with multiple layers of security modules to isolate our databases from unauthorized access.  We use sophisticated security protocols for communication among applications and we encrypt private information, such as an applicant's identification number.  We . . . have safeguards designed to protect such information, including the application of Advanced Encryption Standard . . . .  We also have created controls to limit employee access to such information and to monitor access."  Moreover, the Registration Statement represented that "we have taken technical measures to ensure the security of such personal information and prevent the personal information from being divulged, damaged or lost."

77.     These statements were false and misleading because they failed to disclose that the Company had extremely lax internal controls and poor security procedures over client information and no effective data protection policy in place at the time of IPO.  Most employees could freely download client data for unauthorized purposes.  Moreover, the Company had **already** experienced a massive data breach in early 2017, pursuant to which over a million student borrowers' personal information was leaked into the black market.

78.     The Registration Statement also stated that the Company's "business and operations may be adversely affected" "if" the Company was "unable to protect the confidential information of [its] users."  Similarly, the Registration Statement stated that "if" its security measures were breached, such a breach "could" expose the Company to "the loss of the information, time-consuming and expensive litigation and negative publicity" and the Company's "relationships with users could be severely damaged, we could incur significant liability and our business and operations could be adversely affected."  The Registration Statement further noted that the Company "had experienced one system outage during the holiday seasons in China due to competition for available cloud computing services provided by our service provider," but only disclosed the **possibility** that "[e]rrors or other design defects within the software one which we rely may result in a negative experience for users . . . **or compromise our ability to protect user data** . . . ."  (Emphasis added).

79.     Similarly, the Registration Statement disclosed only the **possibility** that "[m]isconduct and errors by our employees and parties we collaborate with could harm our business and reputation," including "if personal information was disclosed to unintended recipients . . . ."

80.     Likewise, the Registration Statement only disclosed the *possibility* that "[i]f we are unable to protect the confidential information of our users and adapt to the relevant regulatory framework as to protection of such information, our business and our operations may be adversely affected," and the *possibility* that the Company's security measures "could" be breached.

81.     While the Registration Statement acknowledged the material importance to investors of protecting Qudian's customer information and preventing the leak of customer data, it failed to disclose that the Company lacked adequate data security controls and that a data breach had already occurred and compromised nearly one million borrower accounts.  The conditional statements of potential harm in the Registration Statement were thus materially misleading in and of themselves.

82.     In short, the Registration Statement represented to investors that prior to the IPO the Company had taken a number of steps to minimize regulatory risk and ensure Qudian's operations complied with applicable lending and collection laws, that the Company had robust protocols in place to protect customer's data and comply with information security laws, and that Qudian's rapid growth rate was the product of legitimate and sustainable business practices. However, as detailed herein, those representations were untrue.

### i.   <u>Illegal Loans to Students</u>

83.     Qudian, formerly known as Qufenqi, which translates to "Fun Installments", started its business by facilitating merchandise credit and cash credit (*i.e.*, loans) to college students on campuses across China.  At the time, the Chinese government prohibited banks from issuing credit cards to college students out of concern over college students' inability to pay off credit card debts.  Qudian stepped into this void by offering short term loans to Chinese college

students whose demand for consumer products, particularly computers, cell phones and luxury items, was growing rapidly, and no other credit products were available to them.

84.     Through its early aggressive promoting of its lending business on campuses to college students, the Company quickly grew into "the largest online provider of small cash credit products in China in terms of the number of active borrowers and the amount of transactions in the six months ended June 30, 2017."  "In the six months ended June 30, 2017, [the Company] facilitated approximately RMB38.2 billion (US$5.6 billion) in transactions to 7.0 million active borrowers."

85.     With internet financing platforms like Qudian growing on China's college campuses, increasing numbers of young college students were lured into overspending and were overburdened from easy credit and usurious loans. Alerted to this mounting problem, the Chinese Banking Industry Regulatory Commission issued a ***Guiding Opinion on Banking Industry's Risk Control Work*** on April 10, 2017, prohibiting internet financing companies from issuing loans to college students younger than 18 year old.  On June 18, 2017, The Chinese Banking Industry Regulatory Commission, Ministry of Education and Ministry of Human Resources and Social Security together issued a ***Notice regarding Further Strengthening the Regulating Work on Loans on Campuses***, suspending all internet financing companies' lending businesses on campuses and demanding those companies phase out existing on-campus lending businesses.  On September 6, 2017, the Ministry of Education held a press conference at which it expressly stated that "campus lending is forbidden; no internet financing institutions shall issue loans to college students."[5]

86.     Defendants claimed in the Registration Statement that in November 2015 the Company had terminated its original business of facilitating credit to college students on

---

[5] http://m.news.cctv.com/2017/09/06/ARTIpYZAqcD8S7bOY4RSMqDu170906.shtml

campuses across China and shifted to a broader base of young consumers in China. Defendant Luo also represented to investors in the October 22 Interview, four days after the Company's IPO, that the Company had terminated its business of lending money to students because the government had outlawed it. Now, according to Luo, the Company would reject an applicant's borrowing request when the applicant was a student. As Defendant Luo represented in the interview, one way of discerning whether such applicant was a student was by looking at his address. Luo claimed that if a prospective borrower provided a dormitory address or even a residential address outside but close to a college campus, the Company would not issue loans to such applicants.[6] However, Luo also admitted in the interview that Qudian has no effective means to filter out college students from its borrower base. This also cast doubt on the claims in the Registration Statement's that the Company believes that its "big data analytics capability to understand our prospective borrowers from different behavioral and transactional perspectives, assess their credit profiles and offer them instantaneous and affordable credit products with customized terms distinguishes our business and offerings" was a strength of the Company.

87.    Defendants' statements that Qudian terminated its business of lending to college students were untrue.

88.    FE1, a former supervisor of Qudian's main collection department who had worked at Qudian until April 2018, disclosed that before November 2016, the primary collection targets were students, with a successful collection rate of about 92%. As of April 2018, the primary collection targets are 18-25 year old high-credit-level customers who are active in Alipay. The entry age for college in China is 18. Based on the sixth census conducted by the National Bureau of Statistics of the People's Republic of China in 2010, over 11% of 18-year-

---

[6] "Min Luo of Qudian Responds to Everything", October 22, 2017,
https://mp.weixin.qq.com/s/ffFIDiGSaywB9ZZ9SeqDig

olds are college students.[7]  Qudian's cash loan business, which accounts for the majority of its business, did not require applicants to submit their addresses.  Because Qudian used an address-based strategy for attempting to screen out college students, it had no way to discern whether or not an applicant is a college student for its applicants for cash loans where no address was submitted.

89.     An investigation conducted by the *Beijing News*, a major Chinese newspaper[8] also confirmed that Qudian continued issuing loans to college students at the time of and after the Company's IPO.  In the investigation published on October 25, 2017, one senior college student Juan Wu (pseudonym) received a RMB 2,900 cash loan from the Qudian mobile app after submitting her ID number and college address.   Another two college students obtained installment loans after submitting their ID numbers and addresses located within the college.

90.     FE2 explained that his job at Qudian from May 2016 to December 2017 was primarily to promote Qudian's "installment" loan products to college students in Guangzhou, for purchasing "3C" items such as computers, cellphones, and cameras.  FE1 stated: "I and my team members were just responsible for developing student borrowers on school campuses."   He further stated that "after the student completed the online registration, I and my team checked the applicant's qualifications, which include basic identity papers and certifications, such as student ID card, China ID card, student academic performance card, and critical personal information, including data about students' parents and their contact numbers."   FE2 stated that Qudian had not terminated its business of lending to students and was still issuing loans to students on college campuses until at least the end of December 2017, three months after the IPO, and after news of the scandal broke, contrary to  representations to the public in the Registration Statement.

---

[7] http://www.stats.gov.cn/tjsj/pcsj/rkpc/6rp/indexch.htm
[8] http://finance.sina.com.cn/money/bank/dsfzf/2017-10-27/doc-ifynhhay5857503.shtml

91.     As late as May 2018, the popular Chinese smartphone app download website www.eeomarket.com showed the following description for a Qudian app: "Show your student ID and receive zero down payment for all products on the website!  Qufenqi is China's largest online shopping platform for college students.  Show your student and receive zero down payment for all products on the website, low interest rate!  We strive to provide college students with the most convenient mobile payment shopping experience [most trusted by college students].  Coverage includes 300+ cities, 2500+ campuses.  Fast verification, trusted by college students."  The page indicates that it was last updated on April 12, 2018, almost six months after the IPO.

92.     A May 2018 search for Qudian using Chinese characters on China's leading search engine, Baidu, yielded Qudian's qufenqi.com and qd.qufenqi.com websites as two of the top three results.  The description for Qufenqi provided was "online loan service platform for college students."

**ii.  Illegal Collection Practices**

93.     The Company stated in the Registration Statement that it had established strict internal policies governing collections and that its collections personnel do not engage in illegal or even aggressive collection practices.  Defendant Luo even assured the public in the October 22 Interview that the Company never used illegal or aggressive collection practices. Defendants' statements about the Company's collection practices were untrue.

94.     The Company's standard collection practices included utilizing abusive language and threats of financial and social harm to pressure borrowers to repay loans.  For college student borrowers, Qudian would contact their teachers, parents and spouses in order to threaten,

embarrass and pressure the borrowers or their parents to pay off the loans. One Qudian employee even felt responsible for the suicide of a borrower.

95.     An article entitled "CEO has become a dumb teammate: multiple Qudian 'violent' collection cases, blood in face from slapping," dated October 24, 2017,[9] published text messages that student borrowers received from Qudian collection staff, proving that Qudian bombarded students and their parents with chains of messages and telephone calls, threatened to report the overdue loans to their schools so that students wouldn't be able to graduate, and visited parents to request the repayments. One student said that even after he reported the collectors' conduct to Qudian customer service, collectors continued to call, threaten, and curse him and his family.

96.     FE3 states that she underwent Beijing Happy Time's standard training provided for all of Qudian's collection personnel. In her training, Qudian taught her and other employees Beijing Happy Time's standard loan collection guidance and policies. She said that the standard practice was that when a loan was overdue by over 30 days, Qudian would employ firmer methods than just "gentle telephone calls" to chase the borrower, including "verbal abuse and attack." FE3 also stated that her colleagues who were responsible for collecting loans overdue by 30 days employed methods of verbal personal abuse and attack on student borrower's parents. FE3 recalled that one of her female colleagues who was responsible for telephone-based collection inquiries quit the job because a student borrower with an overdue loan committed suicide in the summer of 2016 after she called the student's parents several times regarding a long-overdue loan; eventually, the parents cried "it's pointless to call again, my kid can't repay the loan anymore, because my kid killed himself." The female colleague soon resigned from Qudian because she believed she caused the student borrower to have killed himself.

---

[9] https://www.wdzj.com/zhuanlan/guancha/17-5662-1.html

97.     In contrast to Qudian's claim in its Registration Statement that it has "established strict internal policies that our collections personnel do not engage in aggressive practices," Qudian's abusive collection practices were actually widespread.

98.     While the Registration Statement discloses that Qudian will make telephone calls to delinquent borrowers and notify the Zhima Credit reporting agency, it fails to disclose the aggressive collection practices it employed.

99.     FE1, a former supervisor in Qudian's collection department, disclosed that the main collection method the department employed was calling not just borrowers, but also their families, in an effort to embarrass and pressure them.

100.     FE4, who developed markets for Qudian in several cities, admitted that Qudian's standard collection methods with respect to student borrowers were to contact the students' teachers and parents and even go to their dormitories based on the information that such student borrowers provided to Qudian.  FE5, who was mainly responsible for chasing student borrowers with overdue loans in Tianjin City, stated that for collecting loans overdue between 16 days to 30 days, "the typical collection method is to contact student borrowers' parents.  Most parents repaid for their kids sadly."  FE6, who was mainly responsible for collecting loans that were overdue by less than 50 days, stated that for loans overdue by 30 to 50 days, he contacted borrowers' parents and sometimes sent them threatening messages.

101.     When asked about whether the Company encouraged its borrowers to borrow from other platforms and relatives to repay Qudian's loans, Defendant Luo flatly denied it,[10] contrary to the truth.  The reporter asked: "Did you deliberately instigate the people to borrow money from their relatives and friends or from other platforms to repay your money when they

---

[10] "Min Luo of Qudian Responds to Everything", October 22, 2017, https://mp.weixin.qq.com/s/ffFIDiGSaywB9ZZ9SeqDig

could not afford the money?"  Luo answered: "No.  If the loan is not repaid overdue, we regard it as a bad debt.  We never urge them to repay money to compensate this bad debt.  We even won't call them by phone.  If you don't pay back the money, *we'll send it to you as welfare*.  That's it." (Emphasis added).  In contrast, FE6 stated that "of course, I could also suggest that the borrower apply for a new loan to repay the overdue loans."

102.    News reporting reproduced text messages from a Qudian debt collector threatening to interfere with a student's graduation if the debt was not repaid, and another accusing a borrower of fraud and stating that he would be prosecuted.[11]

103.    In a post published on October 24, 2017, it was disclosed that a group of over 30 students had Qudian loans taken out in their name without their consent.  The students contacted the police and Qudian, which continued to try to collect the loans for well over a year, and even after finally stopping collection efforts and suspending interest accrual, refused to cancel the indebtedness.[12]

104.    The Registration Statement claimed that "[t]he Company places a high value on its credibility and reputation in the community.  What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively.  Our policy is to provide timely, accurate and complete information in response to public requests . . . ."  Defendant Luo's October 22 Interview was widely criticized as not having provided accurate and complete information, so much so that Luo then withdrew for a period of months from interacting with the press.

---

[11] https://mp.weixin.qq.com/s/50l972tB1BksuM0E7eKz2g

[12] http://ts.21cn.com/tousu/show/id/245012

### iii.    __Illegal Annual Interest Rate__

105.     Qudian's Registration Statement disclosed that in accordance with the ***Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases issued by the Supreme People's Court of the PRC*** issued on August 6, 2015, effective on September 1, 2015, or the ***Private Lending Judicial Interpretations***, which came into effect on September 1, 2015, if the annual interest rate of a private loan is higher than 36%, the excess will be void and will not be enforced by the courts.    Article 29 of the same ***Private Lending Judicial Interpretations*** further provides that the overdue loan interest rate, in addition to the ordinary 36% maximum loan interest rate, shall not exceed 24%.[13]

106.     Qudian represented in the Registration Statement that in an effort to comply with potentially applicable laws and regulations, it adjusted the pricing of all its credit products in April 2017 to ensure that the annualized rates charged on all credit drawdowns do not exceed 36%.    Defendant Luo in the October 22 Interview also confirmed that the 36% annualized interest rate was the boundary which Qudian didn't cross.    Luo even left a message underneath the article that published the interview that he would pay a RMB 1 million reward to whoever could show that Qudian's nominal and actual interest rates exceed 36%.[14]    The Registration Statement never expressly disclosed that the Company was also required to comply with the maximum 24% overdue interest rate set by the same Judicial Interpretation it disclosed in the Registration Statement, although it stated that it sought to comply with potentially applicable laws and regulations.

107.     In truth, Qudian routinely imposed or attempted to impose penalty rates far above the maximum allowable 24% penalty rate.    FE7, who was a former risk manager with Qudian

---

[13] http://www.court.gov.cn/fabu-xiangqing-15146.html
[14] http://www.pingwest.com/shame-on-luomin/

Group from August 2014 to March 2018, five months after Qudian's IPO, disclosed that when a loan became overdue, Qudian imposed a ***daily*** overdue interest rate of 5% of the unpaid loan as a "penalty."  This is 1,825% on an annualized basis, 76 times higher than allowed under Chinese law.  FE6, who worked in the cities of Liaocheng, Tai'an, Dezhou and Heze, stating that before 2016, Qudian Group's ***daily*** overdue interest rate to students was about 1%, *i.e.*, a 365% annualized interest rate, 15 times more than allowed under Chinese law.

### iv.  Undisclosed Data Breach

108.   On November 20, 2017, reporter Nian Xuanbing published an article entitled "Qudian Data Suspected to Have Been Leaked; 100 Grand Can Buy A Million Students' Information" in Chinese financial technology news outlet *Yiben Caijing*,[15] revealing that over a million Chinese student borrowers' personal information had been stolen from Qudian and was being sold on the black market. Such information included students' loan amounts, paid off amounts, overdue time and penalties, school and dormitory information, graduation dates, their parents' and girlfriends/boyfriends' telephone numbers, even students' passwords to their accounts at the online China Higher Education Student Information and Career Center ("CHESICC"), which is the official website authorized by Chinese Ministry of Education, hosting such information as national student financial aid, college enrollment, diploma checkup, students' record and qualification management and graduates' employment.  *See* Figures 2, 3, 4 and 5 below.

---

[15] http://tech.sina.com.cn/csj/2017-11-20/doc-ifynwnty6115642.shtml

Figure 1. Source: http://tech.sina.com.cn/csj/2017-11-20/doc-ifynwnty6115642.shtml

赵███ 父子 15███                              9 孙███ 母子 15███ ‖

签署人：王███。牛███ 为男友，负责还款。‖系统自动更新已收货

‖系统自动更新已收货

黄██ 父子 1███     1‖系统自动更新已收货

‖系统自动更新已收货

‖系统自动更新已收货

张██ 父亲 15███    ‖系统自动更新已收货

dhh

新号：18██████ ‖系统自动更新已收货

任██ 父亲 13███    ‖系统自动更新已收货

符██，好友 13███     ‖系统自动更新已收货

李██ 父子 15███    ‖系统自动更新已收货

学信网已验证‖系统自动更新已收货

郝██ 父亲 18███     ‖系统自动更新已收货

安██ 父亲 1███    ‖系统自动更新已收货

学信网已认证‖系统自动更新已收货

乌██ 姐姐 1███     ‖系统自动更新已收货

胡██ 父亲 1███    ‖系统自动更新已收货

梁██ 父子 1███    ‖系统自动更新已收货

学信网已认证‖系统自动更新已收货

常██ 父亲 13███    ‖系统自动更新已收货

包██ 父子 13███     ‖系统自动更新已收货

姐姐 18██████ 6‖系统自动更新已收货

学信网认证‖系统自动更新已收货

无法接通

刘██ 父女 15███    ‖系统自动更新已收货

李██，母亲 13███     ‖系统自动更新已收货

Figure 2. Source: http://tech.sina.com.cn/csj/2017-11-20/doc-ifynwnty6115642.shtml



Figure 3. Source: http://tech.sina.com.cn/csj/2017-11-20/doc-ifynwnty6115642.shtml

| 51279 | 南京市 | 严 | | 15 |
| 51280 | 常州市 | 徐 | | 15 |
| 51281 | 常州市 | 赖 | | 15 |
| 51282 | 盐城市 | 彭 | | 15 |
| 51283 | 宿迁市 | 周 | | 18 |
| 51284 | 扬州市 | 魏 | | 18 |
| 51285 | 南京市 | 卢 | | 15 |
| 51286 | 南京市 | 陈 | | 18 |
| 51287 | 南京市 | 钱 | | 15 |
| 51288 | 苏州市 | 杨 | | 17 |
| 51289 | 苏州市 | 杨 | | 13 |

Figure 4. Source: http://tech.sina.com.cn/csj/2017-11-20/doc-ifynwnty6115642.shtml

109.     The reporter found that the stolen data was being sold on the black market since

early 2017.  The information of the student borrowers in Beijing, Shanghai and Jiangsu was on

sale for RMB 8000 for each city (approximately U.S. $1,262). The entire set of nationwide data

was on sale for nearly RMB 100,000 (approximately U.S. $15,775).  Many online loan agents

bought the data to promote their business.  In the second half of 2017, out of concern for the

severe criminal punishment levied by the new Internet Security Law (effective on June 1, 2017)

on illegal sales of data, the demand for Qudian student borrowers' data on the black market cooled down a little.  Data sellers stopped selling the data openly, and instead secretly sold the data only through known connections.  The reporter conducted a sample test and called some students in the stolen data sets.  Most of the students acknowledged that they indeed borrowed money from Qudian and information the reporter had from the data sets was mostly accurate.  Some students told the reporter that they received more than a few cold calls inquiring whether they needed to borrow money and had been wondering how those callers knew of their borrowing history and whether their personal information was leaked.

110.    The reporter interviewed a hacker who goes by the moniker CC.  He reviewed the stolen data sets and told the reporter that the data format suggested that Qudian insiders directly downloaded them, rather than hackers hacking into Qudian's system.  Multiple former Qudian employees all confirmed to the reporter that Qudian's client data could be freely downloaded within the company depending on an employee's level.  The higher the employee's level, the more data such employee could download.  One former employee, identified in news reports by the name Chen Yiran, stated that she downloaded Qudian client data herself in the past without authorization.  She compared the leaked data and her own downloaded data and confirmed the leaked data was from Qudian.  Ms. Chen believed that it was highly likely that people from Qudian's internal auditing department or collections department downloaded the data because ordinary employees lacked access to download such a large scale nationwide data packet.  Ms. Chen disclosed that an abrupt mass layoff in 2016 caused tremendous discontent and grudges against the Company and Defendant Luo.  Ms. Chen suspected that those former employees sold the client data for revenge and profit.

111.    Former employees also confirmed that since its inception, Qudian's internal control over its clients' highly confidential personal information had been so lax that even lower level employees could access and download client data at their level without authorization.  FE8, a former region manager of Qudian Group from December 2013 to November 2014, revealed that before 2015, employees at Qudian Group were able to access all client data at their respective levels.  He gave examples that a campus manager could access all the client data of the campus which he/she was responsible for, and city manager for his/her city, *etc*.

112.    FE 9, a former risk control manager of Qudian Group from March 2014 to April 2017, who oversaw Qudian Group's credit audit department and collection department in the Beijing headquarters, stated that prior to 2016, all of the employees of credit audit department and collection department (including both of ordinary employees or supervisors) could easily access all of Qudian's clients' personal information including PRC ID, phone number, loan amount, parent information and etc. without any restraint.  Beginning in 2016, Qudian attempted to implement a security protocol that gave only department managers and above access to certain sensitive customer information such as the full 11 digit mobile phone number. Ordinary employees were only to be given access to the last 4 digits.  FE 9 further stated that although the enhanced measures were implemented beginning in 2016, they were a failure and did not prevent unauthorized access by Qudian employees.  This confirms similar statements made by former employees reported in the *Beijing News*.  FE9 believes that disgruntled former employees were responsible for the data breach.

113.    Defendants represented to investors in the Registration Statement that under the ***Several Provisions on Regulating the Market Order of Internet Information Services***, issued by the Ministry of Industry and Information Technology of China ("MIIT") on December 29,

2011, effective on March 15, 2012, an internet information service provider is required to properly maintain its users' personal information, and in case of any leak or likely leak of the users' personal information, the Internet information service provider must take immediate remedial measures; in addition, pursuant to the ***Decision on Strengthening the Protection of Online Information issued by the Standing Committee of the National People's Congress*** issued and effective on December 28, 2012 and the ***Order for the Protection of Telecommunication and Internet User Personal Information*** issued by the MIIT on July 16, 2013, effective on September 1, 2013, an internet information service provider must also keep user personal information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or providing such information to other parties. An Internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss.

114. Defendants falsely represented in the registration statement that "in providing [the] online consumer finance service, [Qudian has] also established information security systems to protect the user information and to abide by other network security requirements under such laws and regulations." FE1, a former supervisor at Qudian's collection department revealed that he drafted the "Information Security Confidentiality Agreement" for Qudian Group in December 2017 and that all of Qudian Group's employees who were able to access client data are now required to sign this agreement. This was two months ***after*** the IPO.

115. The data leaked from Qudian were used by fraudsters to commit crimes. On August 17, 2017, Shaanxi Province Mei County People's Court issued a criminal judgment, (2017) Shaan 0326 Xing Chu No. 71, sentencing Li Yongxian to 6 years of imprisonment with

monetary penalties for illegally purchasing personal data of borrowers of online financing institutions, including Qudian, and defrauding those borrowers.  China Judgements Online, the national judgment and order free public database maintained by the Supreme People's Court of China, published the criminal judgment on August 30, 3017.[16]

116.    It may be inferred that Qudian was informed by the police and prosecutors of the trial and conviction for the theft and illegal use of Qudian's client data.   Indeed, absent negligence, Defendants would have known of the data breach and of the actual crimes committed using stolen Qudian client data.

117.    Moreover, the Registration Statement did not disclose, as reported by FE10, that for a time Qudian handled client intake on paper, and that the Company did not collect those documents from its employees when they left the company or otherwise ensure their security, resulting in an additional avenue for the personal information of Qudian clients to be compromised. In summary, the statements identified in ¶¶66-82, 86, 93, 97, 104-106, and 113-114 were inaccurate statements of material fact because they failed to disclose, *inter alia*, the following facts that existed at the time of the IPO: (i) that the Company was engaged in illegal and aggressive collection practices; (ii) that the Company was providing online loans to college students despite a governmental ban on the practice; (iii)  the Company was imposing penalty interest rates on overdue loans that far exceeded the lawful overdue rate of 24%; (iv) that the Company had failed to implement necessary safeguards to protect customer data and had little or no data security or internal controls protecting client personal information; and (v) that in early 2017, data for nearly one million Company customers had been leaked for sale to the black market, including names, addresses, phone numbers, loan information, accounts and, in some cases,

---

[16]    http://wenshu.court.gov.cn/content/content?DocID=b65ba47c-4e62-49df-a79d-a7df0130a8de&KeyWord=%EF%BC%882017%EF%BC%89%E9%99%950326%E5%258

passwords to CHESICC, the state-backed higher-education qualification verification institution in China, subjecting the Company to undisclosed risks of penalties and financial and reputational harm.

## VI.     ITEMS 303 AND 503 OF SEC REGULATION S-K

118.     Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the Registration Statement to disclose the facts listed in ¶117 violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated 17 C.F.R. §229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Qudian ADSs speculative or risky.

## VII.     POST-IPO DEVELOPMENTS

119.     Following the IPO, in the October 22 Interview, Qudian's CEO Luo publicly denied rumors that Qudian was: (i) continuing to lend to college students, (ii) engaging in aggressive or illegal collection practices, or (iii) charging illegal interest rates.  Luo stated that Qudian not only does not employ aggressive or illegal collection practices, but that the Company does not even collect overdue loans, choosing instead to immediately charge off overdue loans because of Qudian's extraordinarily low rate of bad loans.  The statements that Qudian does not

even attempt to collect overdue loans contradicted the Registration Statement's explicit disclosures as to the supposedly legal collection practices Qudian employs, shocked investors, and created great confusion as to what Qudian's lending and collection practices were.

120.    On October 23, 2017, two Chinese news articles were published, commenting on Defendant Luo's previous day's interview and correcting certain of the misleading statements in the Registration Statement.[17]

121.    The articles pointed out that contrary to what Defendant Luo claimed in the October 22 Interview, and contrary to what was in the Registration Statement: (i) the Company did in fact employ illegal and aggressive collection methods for overdue loans, and (ii) the Company had not stopped issuing loans to college students in 2015, but actually still continued to loan to college students.

122.    In the wake of the articles, Qudian's stock price sharply plunged by 19.42% to $26.59, a $6.41 per share drop from the previous close.

123.    In an attempt to staunch the sharp price drop in Qudian shares caused by the October 22 and 23 news about Qudian's lending and collection practices, and to counter the adverse disclosures in those articles, Qudian issued a press release outlining the collection process that Qudian supposedly utilizes, using language copied from the Registration Statement.

124.    On November 20, 2017, a Chinese article entitled "Qudian Data Suspected to Have Been Leaked; 100 Grand Can Buy A Million Students' Information", was first published on a Chinese financial technology news outlet.[18] Qudian's stock price dropped by 5.28% to

---

[17]    The articles were entitled, "Baloney in the Name of Response to Doubts. What Lies Did Qudian CEO Min Luo Said in Public?"(published on pinwest.com), and "Does Qudian Really Not Collect Overdue Loans? Old Brother from 'Stop Gambling Club' Says This" (published on wechat public account).

[18]    http://tech.sina.com.cn/csj/2017-11-20/doc-ifynwnty6115642.shtml

close at $20.08 per share.  Over the next few days, Chinese news media widely reported the data leak.[19]  On November 23, 2017, a Sunday, Chinse news outlet Sina.com[20] and Bloomberg[21] reported that Chinese regulators and police were probing the Qudian client data breach.  On November 24, 2017, Qudian's stock price plunged by 24.33% to close at $14.41 per share.

125.    On December 12, 2017, the date the first lawsuit in this action was filed, Qudian's ADR price closed at $13.19, approximately 45% below the $24 IPO price.

126.    As a result of Defendants' wrongful acts and omissions, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII.   CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased Qudian ADSs issued pursuant to or traceable to the Company's IPO (the "Class"), and were damaged thereby.  Excluded from the Class are each of the Defendants, their respective successors, assigns, parents and subsidiaries, the past and current executive officers and directors of Qudian and the Underwriter Defendants, the legal representatives, heirs, successors or assigns of the Individual Defendants, and any entity in which any of the foregoing excluded persons have or had a majority ownership interest.

128.    The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class Members is unknown to Plaintiffs at this time but it is believed to be in the thousands.  Members of the Class may be identified by records

---

[19] *E.g.*, https://t.qianzhan.com/caijing/detail/171121-4e349c4d.html; http://www.fromgeek.com/review/127586.html; http://money.163.com/17/1123/18/D3UR1LRT00258169.html; http://usstock.jrj.com.cn/2017/11/24224223694021.shtml.
[20] http://finance.sina.com.cn/stock/usstock/c/2017-11-23/doc-ifypathz5359620.shtml
[21]    https://www.bloomberg.com/news/articles/2017-11-23/china-regulators-police-said-to-probe-qudian-client-data-leak?utm_source=yahoo&utm_medium=bd

maintained by Qudian or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

129.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

130.     Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

131.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws as alleged herein;

(b)     whether the Registration Statement issued by Defendants to the investing public omitted and/or misrepresented material facts about the Company and its business, operations, or prospects; and

(c)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

132.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
## Violation Of Section 11 Of The Securities Act
## (All Defendants Other Than Zhou And Kunlun)

133.    Plaintiffs repeat and reallege each and every allegation contained above, except any allegation of fraud, recklessness, or intentional misconduct.  Plaintiffs specifically disclaim any allegations that are based upon fraud, recklessness, or intentional misconduct.

134.    This Count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants, other than Zhou and Kunlun.  The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.

135.    This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who acquired Qudian ADSs pursuant to and/or traceable to the Company's IPO.  Each Class Member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement.   Qudian is the issuer of the ADSs through the Registration Statement.  The Individual Defendants are signatories to the Registration Statement.

136.    The Underwriter Defendants owed to the holders of the ADS obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, Defendants are liable to the Class.

137.     Defendants owed to the purchasers of the shares obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

138.     None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

139.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct alleged herein, Defendants violated and/or controlled a person who violated Section 11 of the Securities Act.

140.     At the times they obtained their shares of Qudian, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

141.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

142.     By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of the Section 11(e), from the Defendants and each of them, jointly and severally.

143.     Plaintiffs filed this action within one year of the false and misleading statements and within three years of their purchase of Qudian securities.

**COUNT II**
**For Violation Of Section 12(a)(2) Of The Securities Act**
**(Against All Defendants)**

144.    Plaintiffs repeat and reallege each and every allegation contained above, except any allegation of fraud, recklessness, or intentional misconduct. Plaintiffs specifically disclaim any allegations that are based upon fraud, recklessness, or intentional misconduct.

145.    By means of the defective Prospectus, Defendants promoted and sold Qudian stock to Plaintiff and other members of the Class.  Defendants actively solicited purchasers of stock for the IPO by, among other things, preparing, disseminating and presenting to potential investors and otherwise eliciting investor participation in the IPO.  As a result, Defendants were "statutory sellers" for the purposes of Section 12(a)(2) of the 1933 Act.  Additionally, Qudian was a statutory seller under SEC Rule 159A, which provides that an issuer is a statutory seller for the purposes of Section 12(a)(2) regardless of the form of underwriting.

146.    The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiffs and the other members of the Class who purchased Qudian ADSs pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

147.    Neither Plaintiff nor the other members of the Class knew, or in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time they acquired Qudian ADSs in the Offering.

148.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Plaintiffs and the other members of the Class who purchased Qudian ADSs pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock.  Accordingly, Plaintiffs and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

## COUNT III
### For Violation Of Section 15 Of The Securities Act
### (Against The Individual Defendants And The Selling Shareholder Entity Defendants)

149.    Plaintiffs repeat and reallege each and every allegation contained above, except any allegation of fraud, recklessness, or intentional misconduct. Plaintiffs specifically disclaim any allegations that are based upon fraud, recklessness, or intentional misconduct.

150.    This claim is asserted against the Individual Defendants and the Selling Shareholder Entity Defendants, each of whom was a control person of Qudian during the relevant time period.  The Individual Defendants and Selling Shareholder Entity Defendants were control persons of Qudian by virtue of their positions as directors and/or senior officers of the Company, as well as their status as stockholders and their ability to cause the Company to arrange and execute the IPO and disseminate the Registration Statement in connection therewith.

151.    The Individual Defendants and the Selling Shareholder Entity Defendants were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

152.    None of the Individual Defendants or the Selling Shareholder Entity Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

153.    Plaintiffs and the Class have sustained damages.  The value of Qudian ADSs has declined substantially due to the Securities Act violations alleged herein.

154.    By reason of the above conduct, for which Qudian is primarily liable, as set forth above, the Individual Defendants and the Selling Shareholder Entity Defendants are jointly and severally liable with and to the same extent as Qudian pursuant to Section 15 of the Securities Act.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives and Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel's fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## X.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Respectfully submitted,

Dated: May 18, 2018                     **GLANCY PRONGAY & MURRAY LLP**


By: *s/ Joseph D. Cohen*
Joseph D. Cohen
Jonathan M. Rotter
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
jcohen@glancylaw.com
jrotter@glancylaw.com

**JACK I. ZWICK**
Jack I. Zwick (JZ-2514)
100 Church Street, Suite 850
New York, New York 10007
Telephone: (212) 385-1900
Facsimile: (212) 385-1911
jack@zwickfirm.com

*Co-Lead Counsel for the Plaintiffs and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On May 18, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 18, 2018.


*s/ Joseph D. Cohen*
Joseph D. Cohen

# Mailing Information for a Case 1:17-cv-09741-RA Ramnath et al v. Qudian Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam M. Apton**
  aapton@zlk.com

- **Stephen Patrick Blake**
  sblake@stblaw.com,managingclerk@stblaw.com,nanderson@stblaw.com

- **Jeffrey Philip Campisi**
  jcampisi@kaplanfox.com

- **Garam Choe**
  garamc@johnsonfistel.com

- **Joseph Daniel Cohen**
  JCohen@glancylaw.com,info@glancylaw.com

- **Joshua Lon Crowell**
  jcrowell@glancylaw.com,joshua-crowell-3496@ecf.pacerpro.com

- **Michael Benjamin Eisenkraft**
  meisenkraft@cohenmilstein.com,efilings@cohenmilstein.com

- **Richard William Gonnello**
  rgonnello@faruqilaw.com,msullivan@faruqilaw.com,ecf@faruqilaw.com,klenahan@faruqilaw.com,dbehnke@faruqilaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Bo Bryan Jin**
  bryan.jin@stblaw.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **James Glenn Kreissman**
  jkreissman@stblaw.com,managingclerk@stblaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Sherief Morsy**
  smorsy@faruqilaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jonathan M Rotter**
  jrotter@glancylaw.com,jonathan-rotter-5262@ecf.pacerpro.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

Case 1:17-cv-09741-JMF   Document 109   Filed 05/18/18   Page 48 of 48

- **Jack I. Zwick**
  Jack@zwickfirm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`