UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X
                                                  :
IN RE:                                            :       17-CV-9741 (JMF)
                                                  :
QUDIAN INC. SECURITIES LITIGATION                 :       OPINION AND ORDER
                                                  :
------------------------------------------------------------------------- X

JESSE M. FURMAN, United States District Judge:

In this putative class action, Plaintiffs bring securities fraud claims against Qudian Inc. (the "Company"), several of Qudian's employees and board members, the institutions that sold Qudian shares on behalf of the company or its individual members, and the banks that acted as underwriters for the Company's October 18, 2017 initial public offering. Plaintiffs, who purchased American Depositary Shares ("ADS") in or traceable to the IPO, allege that the Registration Statement and Prospectus that Qudian filed with the Securities and Exchange Commission (the "SEC") in advance of the IPO contained false and misleading statements and omitted material facts in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims. For the reasons that follow, the motion is granted.

## BACKGROUND

The following facts — which are taken from the Second Amended Class Action Complaint (the "SAC"), *see* ECF No. 134, documents it incorporates (including but not limited to the Registration Statement and Prospectus filed in connection with the IPO), and matters of

which the Court may take judicial notice — are assumed to be true and construed in the light most favorable to Plaintiffs. *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013).[1]

**A. Qudian's Registration Statement and the IPO**

Founded in 2014, Qudian is a company based in China that offers online cash and installment loans primarily to Chinese consumers. SAC ¶ 3. In anticipation of going public in the United States, the company filed a Registration Statement with the SEC on or about September 18, 2017. *Id.* ¶ 67. Exactly one month later, the company filed its final Prospectus and Registration Statement.[2] *Id.* ¶¶ 1, 4, 67, 140; *see also* ECF No. 161-1 ("Registration Statement"). Plaintiffs' claims relate to five categories of representations or alleged omissions in these offering materials. The Court will summarize each in turn.

**Lending to College Students.** First, the offering materials state that Qudian "initially . . . facilitat[ed] merchandise credit and cash credit to college students" in China, but that — "starting from November 2015" — it had "shifted [its] focus to a broader base of young consumers" and, as a result, had "terminated [its] initial business of facilitating credit to college students on campuses across China." Registration Statement at 5, 87. Elsewhere, the offering

---

[1] Plaintiffs filed a motion to strike various exhibits filed by Defendants in support of their motion. ECF No. 159. Putting aside that the motion is arguably procedurally improper, *see, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Hicks, Muse, Tate & Furst, Inc.*, No. 02-CV-1334 (SAS), 2002 WL 1482625, at *6 (S.D.N.Y. July 10, 2002) ("Rule 12(f) allows a court to strike *pleadings* only. Declarations and affidavits are not pleadings."), the Court need not rule on the motion. In the discussion that follows, the Court relies on only three of the disputed exhibits — all newspaper articles — and only then for the fact that they were published, which Plaintiffs themselves concede is proper. *See* ECF No. 162, at 5; *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008) (noting that a district court may take judicial notice of newspaper articles "for the purpose of establishing that the information in the various documents was publicly available"). Accordingly, the motion to strike is denied as moot.

[2] As the Prospectus is a part of the Registration Statement, *see* SAC ¶ 67; ECF No. 161-1, at 14, the Court refers to the full Registration Statement, along with its amendments and exhibits, at ECF No. 161-1 as the "Registration Statement" or the "offering materials."

2

statements reference "the shift of [Qudian's] target borrower base from college students to young consumers in general." *See, e.g.*, *id.* at 26, 37, 120, 123; *see also* SAC ¶¶ 84-92. In 2017, the Chinese government, increasingly concerned about college students' ability to pay off their debts, issued a series of regulations that prohibited college student lending. SAC ¶¶ 5, 85-86.

**Debt Collection Practices.** Second, the offering materials state that Qudian had "established strict internal policies that [its] collection personnel do not engage in aggressive practices," and similarly, that Qudian "aim[ed] to ensure" that its "collection effects comply with the relevant laws and regulations in the [People's Republic of China]." Registration Statement at 34. In reference to particular collection practices, Qudian explained that "[o]nce a repayment is past due," it sends "reminder text and instant messages during the first two calendar days of delinquency," *id.* at 185; that if the payment is outstanding after that step, it "initiate[s] automated voice calls," *id.*; and that if the payment is outstanding after both preliminary steps, its employees make direct phone calls and disclose the delinquency to a credit reporting agency, *id.* The offering materials note that the company "may" stop its collection efforts after a payment is overdue by more than 180 days "and collection attempts have reached a certain number." *Id.*

**Lending Fee Rates.** Third, the offering materials note that Chinese law "provide[s] that agreements between the lender and borrower on loans with interest rates below 24% per annum are valid and enforceable" and that "[i]f the annual interest rate of a private loan is higher than 36%, the excess will be void and will not be enforced by the courts." Registration Statement at 31, 189. They further state that, "[i]n an effort to comply with potentially applicable laws and regulations, [Qudian] adjusted the pricing of all [of its] credit products in April 2017 to ensure that the annualized fee rates charged on all credit drawdowns do not exceed 36%." *Id.* at 36. And elsewhere, indeed in several places, they state that the regulatory framework for the

3

consumer finance market was "evolving," could "remain uncertain," and was generally "still at a nascent stage and subject to further change and interpretation." *Id.* at 22, 28, 38.

**Data Security.** Fourth, the offering materials discuss "laws and regulations in regard of the protection of personal information," and the responsibility those laws and regulations impose on Qudian to, among other things, take "technical measures to ensure the security of . . . personal information and prevent the personal information from being divulged, damaged, or lost." Registration Statement at 47. Further, the offering materials report that Qudian had "taken steps to protect [users'] confidential information." *Id.*

**Auto Financing.** Finally, the offering materials note that Qudian "may selectively expand into other credit products that are in strong demand by targeted prospective borrowers and potentially offer higher returns, such as secured credit products *and auto loans*." Registration Statement at 158 (emphasis added). Relatedly, the materials state that Qudian intended to use the net proceeds of the IPO for "marketing and borrower engagement activities," "strategic acquisitions," and "general corporate purposes," but note that the company's management would "have significant flexibility and discretion in applying the net proceeds of the offering. The occurrence of . . . changed business conditions may result in application of the proceeds of [the IPO] in a manner other than as described." *Id.* at 79.

On October 18, 2017, Qudian held its IPO of ADSs at $24 per share. SAC ¶¶ 1-2. In total, 43,125,000 ADSs were sold to investors pursuant to or traceable to the IPO, netting the company in excess of $1 billion. *Id.* ¶¶ 1-2, 67.

**B. Subsequent Developments**

Four days after the IPO, Qudian's CEO, Defendant Min Luo, gave an interview reiterating that Qudian did not lend to college students, engage in aggressive or illegal collection

practices, or charge illegal interest rates. SAC ¶¶ 18, 134.[3] The next day, however, two Chinese news articles disputed Luo's statements and claimed that Qudian "did in fact employ illegal and aggressive collection methods for overdue loans, and . . . had not stopped issuing loans to college students in 2015, but actually still continued to loan to college students." *Id.* ¶¶ 135-36. "In the wake of the articles," the SAC alleges, Qudian's stock price dropped from $33.00 per share down to $26.59 — a $6.41 drop from the "previous close" (although still higher than the $24 IPO price). *Id.* ¶ 137. On November 20, 2017, another article claimed that "over a million Chinese student borrowers' personal information had been stolen from Qudian" and was being sold "on the black market since early 2017." *Id.* ¶¶ 110-11, 139. The article cited students whose information was gleaned from the stolen data, a hacker who claimed that "the data format suggested that Qudian insiders directly downloaded them," and a former employee who believed that "it was highly likely that people from Qudian's internal auditing department or collections department downloaded" and perhaps sold the data. *Id.* ¶¶ 111-12. Qudian's stock price again dropped, this time to $20.08. *Id.* ¶ 139. On November 23, 2017, two news outlets "reported that Chinese regulators and police were probing the Qudian client data breach." *Id.* On or about November 24, 2017, Alipay — Qudian's largest and primary source of customers — "informed the Company that beginning November 30, 2017, it would cap the effective annualized rate on loans at 24%." *Id.* ¶ 109. An article released that day cited Alipay as stating "that it was

---

[3] Because the SAC relies on the October 22nd interview with Min Luo, the Court would ordinarily be permitted to consider the transcript of the interview. Notably, however, Plaintiffs neither attach the interview transcript as an exhibit to the SAC nor provide a certified translation of the interview. Accordingly, and in light of the Court's obligation to view all facts in the light most favorable to Plaintiffs, the Court takes the factual, non-conclusory allegations as to the substance of the October 22nd interview in the SAC as true. *Cf. Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 90 n.5 (2d Cir. 2009) (deferring, on a motion to dismiss, to the plaintiffs' translations of complaint exhibits where there were potentially significant differences between translations).

5

imposing the cap as a result of its recent discovery of abuse by lenders in charging excessive rates and employing inappropriate methods of debt collection"; Qudian's stock price immediately dropped to $12.22. *Id.* ¶¶ 109, 139. On December 12, 2017, the date this lawsuit was filed, Qudian's stock price closed at $13.19. *Id.* ¶ 140.

On January 15, 2018, Qudian issued a press release officially announcing the "late November 2017" launch of Dabai Auto, "a new, capital-intensive, low-margin business" that sells vehicles through a financial leasing model, and reported that, "[b]y the end of 2017, Qudian ha[d] deployed over 100 off-line user engagement and delivery centers and exhibition areas." *Id.* ¶¶ 120-21, 123. The same day, an article alleged that Qudian had "started to 'lay out' the plan for Dabai Auto before the IPO." *Id.* ¶ 124. The next day, a different article alleged that Dabai Auto "opened over 150 self-owned physical stores" in the two months before the January 15th press release. *Id.* ¶ 125. A couple of months later, on March 12, 2018, Qudian issued a press release stating that, "[b]y the end of January 2018," it had "established 175 off-line showrooms"; that by the end of December 2017, it had "leased out 284 cars"; and that, as of March 10, 2018, it had "cumulatively leased out over 4,800 cars." *Id.* ¶ 126. The release attributed increased sales and marketing expenses to the establishment of the Dabai Auto showrooms. *Id.*

Qudian's April 9, 2018 post-IPO disclosure to the SEC explicitly listed Dabai Auto among the company's risk factors, disclosed that almost half of Qudian's total employees worked for Dabai Auto, and noted that Qudian had used a portion of the IPO proceeds to fund Dabai Auto. *Id.* ¶¶ 126-28. That day, Qudian's stock closed at $10.00. *Id.* ¶ 140. A May 21, 2018 press release attributed further increases in sales and marketing expenses to compensation and travel costs associated with the Dabai Auto business. *Id.* ¶ 130. That day, Qudian's stock closed at $9.59. *Id.* ¶ 140. Shortly thereafter, Plaintiffs amended their complaint to add an

6

allegation that "Dabai Auto had been planned and approved at the highest level of the company at least by the time the IPO was launched, as demonstrated by the massive rollout that began around the IPO," and that "Qudian was entering a capital intensive business in which it would buy tens of millions of dollars worth of automobiles and launch 150 physical stores, a significant departure from what made its microlending business attractive to investors." *Id.* ¶ 9.

All in all, between the October 18, 2017 IPO and the December 12, 2017 filing of this suit, Qudian's stock price dropped from $24 to $13.19. The figures are even more drastic between the October 18, 2017 IPO and the May 21, 2018 press release announcing continued cost increases associated with Dabai Auto: a drop from $24 to $9.59. Plaintiffs attribute these price drops to materially false and misleading statements and material omissions in the Registration Statement. *See, e.g.*, *id.* ¶¶ 154-55. On that basis, they bring claims against Defendants under Sections 11, 12(a)(2), and 15 of the Securities Act. Notably, however, they "specifically disclaim any allegation[]" that sounds in fraud. *Id.* ¶¶ 148, 159, 164.

## APPLICABLE LAW

In reviewing a Rule 12(b)(6) motion, "the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). The Court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim for relief that is facially plausible, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint

that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Here, Plaintiffs' principal claims are brought under Sections 11 and 12(a)(2) of the Securities Act. Section 11(a) provides that any signatory to a registration statement, director of the issuer, or underwriter may be held liable to purchasers of registered securities if the registration statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016). Section 12(a)(2) imposes liability for selling or offering securities by using a prospectus "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission)." 15 U.S.C. § 77*l*(a)(2). Significantly, a plaintiff bringing claims under these provisions need not plead scienter, reliance, or causation. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 169 n.4, 171 (2d Cir. 2004). Additionally, where, as here, claims do not sound in fraud, a plaintiff need not meet "the heightened pleading standard of Rule 9(b)." *Id.* at 171. Thus, "to make out a prima facie case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission." *In re Francesca's Holdings Corp. Sec. Litig.*, Nos. 13-CV-6882 (RJS) & 13-CV-7804 (RJS), 2015 WL 1600464, at *23 (S.D.N.Y. Mar. 31, 2015) (internal quotation marks omitted).

A misstatement or omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Litwin v. Blackstone Grp.,*

*L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (internal quotation marks omitted). Critically, under the "bespeaks caution" doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002); *see* 15 U.S.C. § 77z-2(c)(1)(A)(i). That doctrine may apply "[w]hen there is cautionary language in the disclosure." *Rombach*, 355 F.3d at 173. "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id.* (internal quotation marks omitted). "Cautionary words about future risk," however, "cannot insulate from liability the failure to disclose that the risk has transpired." *Id.*; *see, e.g.*, *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." (internal quotation marks omitted)); *see also, e.g.*, *In re Priceline.Com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 53 (D. Conn. 2004) (noting that the bespeaks caution doctrine is limited to forward-looking statements and does not "negate the effect of" misrepresentations of "historical facts").

## DISCUSSION

In the present case, Plaintiffs claim that Defendants made material misstatements or omissions in the offering materials with respect to five subjects: (1) Qudian's practices of making (or not making) loans to college students; (2) Qudian's use of aggressive debt-collection practices; (3) Qudian's imposition of unlawfully high penalty fees; (4) Qudian's data security

9

protocols; and (5) Qudian's plans to open (and to use a portion of the IPO proceeds with respect to) an auto financing business called Dabai Auto.[4] Applying the standards set forth above, the Court concludes that, with one exception, these claims fail as a matter of the law.

## A. Lending to College Students

First, Plaintiffs allege that the offering materials contain several misrepresentations with respect to Qudian's lending to college students — which the Chinese government prohibited by regulation in 2017. *See* SAC ¶¶ 5, 84-93. In particular, they allege that the materials "falsely" represented that "the Company exited its business of making loans to college students in November 2015 and . . . would reject an applicant's loan application if [he] was a student" when, in reality, the Company "continued to actively operate and promote its business of lending to college students up to the IPO." *Id.* ¶ 5; *see id.* ¶¶ 84-93. As evidence of such ongoing "illegal" lending activity, *see id.* ¶ 8, Plaintiffs point to two confidential witness statements by former employees: the first stating that, "before November 2016, [Qudian's] primary collection targets were students," *id.* ¶ 89, and the second claiming that "his job at Qudian from May 2016 to December 2017 was primarily to promote . . . loan products to college students," *id.* ¶ 91. Plaintiffs also cite a Chinese newspaper's "investigation," which "confirmed that Qudian continued issuing loans to college students at the time of and after the Company's IPO," *id.* ¶ 90, along with the fact that a "popular" third-party "smartphone app download website" described Qudian as catering to college students, *id.* ¶ 92.

---

[4] Plaintiffs also allege misrepresentations with respect to the value that Qudian places on its credibility, reputation, and security. *See* SAC ¶ 105. But such "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

10

For several reasons, these allegations fail to plausibly allege a claim. First, contrary to Plaintiffs' allegations, the offering materials do not actually contain a representation that Qudian "would reject" applications from college students; instead, they represent only that Qudian had shifted its borrower base from college students to a "broader base" of young consumers and terminated its "initial" business of lending on college campuses. *See, e.g.*, Registration Statement at 5, 87.[5] Second, Plaintiffs fail to establish that these statements were false and that Qudian was engaged in a widespread practice of lending to college students at the time of the IPO. One of the two confidential witnesses provided information concerning an earlier period, while the other provided only a conclusory description of his own responsibilities as a regional manager, without "facts that might corroborate" the implication that those responsibilities reflected a widespread policy. *See In re IAC/InteractiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010). Meanwhile, the newspaper article merely establishes that three college students obtained loans at some point in time, SAC ¶ 90, and there is no indication that the description on the third-party "smartphone app download website" was accurate, let alone attributable to Defendants.

Finally, it is well established that an alleged misstatement does not qualify as material if the relevant facts are "already in the mix of public information" at the time of an IPO. *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 488 (S.D.N.Y. 2018). That is the case here: The possibility that Qudian did not, in fact, terminate its college lending business in November 2015 was publicly known at the time of the IPO, as reflected in several newspaper articles, the fact and

---

[5] Luo arguably went further in his statements "four days after the Company's IPO," but those statements are irrelevant to Defendants' liability under Sections 11 and 12(a)(2), which require material misrepresentations and omissions in the Registration Statement and Prospectus filed at the time of the IPO. *See* 15 U.S.C. §§ 77k, 77l(a)(2).

11

timing of which the Court can take judicial notice. *See, e.g.*, ECF No. 144 ("Blake Decl.") Ex. J. (September 21, 2017 article alleging that despite announcing its transition to "non-campus credit services . . . [a]t the actual operation level, [Qudian] has not completely abandoned the campus market"); Blake Decl. Ex. K (September 19, 2017 article alleging that Qudian "does not verify whether [a loan applicant] is a student"); Blake Decl. Ex. L (September 19, 2017 article alleging that "[s]tudents can still obtain loans from [Qudian] under the ban"). Accordingly, Qudian's alleged misrepresentations to the contrary are inactionable as a matter of law. *See, e.g.*, *SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d at 488 (dismissing a claim where "[t]he *Wall Street Journal* had already reported" the relevant facts at the time of CEO's statement).

**B. The Use of Aggressive Debt-Collection Methods**

Next, Plaintiffs allege that Qudian misleadingly "claimed that the Company employed user-friendly and non-threatening debt collection methods that complied with applicable laws and regulations," when, in fact, the company used a variety of aggressive debt-collection methods. Compl. ¶¶ 72, 95. But, viewing the offering materials as a whole, Qudian made no misrepresentation. To the contrary, the Registration Statement explicitly warned investors that the company could *not* assure investors that "personnel will not engage in any misconduct as part of their collection efforts. Any such misconduct . . . or the perception that [its] collection practices are considered to be aggressive and not compliant with the relevant laws and regulations . . . may result in harm to [its] reputation and business, which could . . . have a material adverse effect on [its] results of operations." Registration Statement at 28; *see also id.* at 34 (cautioning that one of Qudian's businesses was under investigation for use of "violence in loan collection processes"). Further, the offering materials disclosed that the company used a series of debt-collection methods that progressively escalated in aggressiveness, from texts to

12

instant messages to automated voice calls to manual phone calls and ultimately to in-person visits. *See id.* at 179. In light of these disclosures, no reasonable investor could claim to have been misled. *See, e.g.*, *Wilson v. MicroFin., Inc.*, No. 03-11883-RGS, 2006 WL 1650971, at *5-6 (D. Mass. June 13, 2006) (rejecting a claim that the defendant had misled investors regarding aggressive debt collection practices where the plaintiff had alleged "nothing more than factual descriptions of [the defendant's] admittedly high pressure collection tactics").

## C. The Imposition of Unlawful Penalty Fees

Third, Plaintiffs allege that Qudian misleadingly represented that it had "adjusted the pricing of all [of] its credit products in April 2017 to ensure that the annualized fee rates charged on all credit drawdowns do not exceed 36%," when, in reality, the company was also charging daily "penalty" fees that exceeded those collectable under Chinese law. SAC ¶¶ 74-75. Once again, however, Plaintiffs mischaracterize the offering materials. These materials stated — in several places — that the regulatory framework for the consumer finance market was "evolving," could "remain uncertain," and was generally "still at a nascent stage and subject to further change and interpretation." Registration Statement at 22, 32, 38. They further disclosed that the "financing service fees received from borrowers" could be deemed to be interest and, if they were, that they "may be subject to the [Chinese government's] restrictions on interest rate[s]," including the 36% upper limit on annualized interest rates of private loans. *Id.* at 31. They went on to warn, in bold and italics, that if Qudian's business practices were "deemed to violate any [Chinese] laws or regulations, [its] business, financial condition, results of operations and prospects would be materially and adversely affected," and reiterated that the applicable regulatory scheme was "ambiguous" and could be "applied inconsistently." *Id.* at 32.

13

Perhaps because of these disclosures, Plaintiffs switch focus somewhat in their opposition to the contention that Qudian failed to detail that Chinese regulations imposed a separate 24% cap on "overdue" interest rates. *See* ECF No. 160 ("Opp'n"), at 21. But Qudian explicitly identified the applicable regulation and disclosed that any rates above 24% might be found unenforceable:

> The Private Lending Judicial Interpretations also provide that agreements between the lender and borrower on loans with interest rates below 24% per annum are valid and enforceable. As to loans with interest rates per annum between 24% and 36%, if the interest on the loans has already been paid to the lender, and so long as such payment has not damaged the interest of the state, the community and any third parties, the courts will turn down the borrower's request to demand the return of the interest payment. If the annual interest rate of a private loan is higher than 36%, the excess will be void and will not be enforced by the courts.

Registration Statement at 189. The fact that Qudian summarized the applicable regulations at a high level of generality rather than providing a detailed accounting of each provision (or quoting it verbatim) does not make the Registration Statement misleading. *See, e.g.*, *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005) ("[T]he securities laws do not require disclosure of information that is publicly known . . . or which constitutes *generally applicable laws and regulations* . . . . The federal securities laws simply do not require the *excruciatingly lengthy and complicated disclosure* that would result if every indicia of the modern regulatory state needed to be compiled, catalogued, and explained to potential investors." (emphases added)).

**D. Data Security Protocols**

For similar reasons, Plaintiffs' next theory — that the offering materials contained material misrepresentations about Qudian's data security protocols, *see* SAC ¶ 116 — also falls short. Although the offering materials state that the company had "'established information security systems,'" *id.* ¶ 116, and had implemented security measures such as "'sophisticated

14

security protocols'" and "'controls to limit employee access to such information and to monitor access,'" *id.* ¶ 77, they *also* disclose that the company's security systems were far from perfect, might not comply with applicable laws, and might have been breached in the past:

> We collect, store and process certain personal and other sensitive data from our users, which makes us an attractive target and potentially vulnerable to cyber-attacks, computer viruses, physical or electronic break-ins or similar disruptions. While we have taken steps to protect the confidential information that we have access to, *our security measures could be breached*. Because techniques used to sabotage or obtain unauthorized access to systems change frequently and generally are not recognized until they are launched against a target, *we may be unable to anticipate these techniques or to implement adequate preventative measures*. Any accidental or willful security breaches or other unauthorized access to our system could cause confidential user information to be stolen and used for criminal purposes. Security breaches or unauthorized access to confidential information could also expose us to liability related to the loss of the information, time-consuming and expensive litigation and negative publicity. If security measures are breached because of third-party action, employee error, malfeasance or otherwise, or if design flaws in our technology infrastructure are exposed and exploited, our relationships with users could be severely damaged, *we could incur significant liability and our business and operations could be adversely affected*.

Registration Statement at 47 (emphases added); *see also id.* at 46-47 ("It is not always possible to identify and deter misconduct or errors by employees or business partners, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses."). The materials further note that the Company "cannot assure you that our existing user information protection system and technical measures *will be considered sufficient under applicable laws and regulations*." *Id.* 47 (emphasis added). And, on top of all that, Qudian shared that it was under examination at the time of the IPO for potential violations of regulations that required "keeping proper custody of the data and transaction information of . . . borrowers" and that "*there can be no assurance* that [the Company] will be able to receive . . . final clearance." *Id.* at 33, 192 (emphasis added); *see also id.* at 194 (noting that, if the company were found "to be not in compliance with [the applicable regulations] . . . [its] business,

15

results of operations and financial position will be materially and adversely affected"). In light of these disclosures, it cannot be said that Plaintiffs plausibly identify a material misrepresentation with respect to Qudian's statements concerning its data security protocols. *See, e.g.*, *In re Heartland Payment Sys., Inc. Sec. Litig.*, No. 09-1043, 2009 WL 4798148, at *5 (D.N.J. Dec. 7, 2009) (dismissing similar claims on the ground that "there is nothing inconsistent between Defendants' statements" that the company "place[d] significant emphasis on maintaining a high level of security" and the fact that the company "had suffered an . . . attack").

### E. Expansion into the Auto Loan Business

By contrast, the Court concludes that Plaintiffs' final theory — that Qudian misleadingly failed to disclose that it was "in the process of launching a new . . . business called Dabai Auto," SAC ¶ 120; *see id.* ¶¶ 9, 120-32 — is sufficient to state a claim under Sections 11 and 12(a)(2). Qudian used approximately $100 million of its $799.6 million in IPO proceeds to fund the opening of Dabai Auto between November 2017 and January 2018. *Id.* ¶¶ 128, 132. Yet the Registration Statement said only that Qudian "may selectively expand into other credit products . . . such as . . . auto loans," Registration Statement at 158, and that the Company planned to use the proceeds of the IPO for "marketing and borrower engagement activities," "strategic acquisitions," and "general corporate purposes," *id.* at 79. If Dabai Auto was merely under consideration at the time of the IPO, these statements would arguably be accurate enough and Plaintiffs' claims would likely fail. *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 14-CV-9826 (WHP), 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 587 (S.D.N.Y. 2005). But if Qudian knew or should have known at the time of the IPO that it was launching Dabai Auto and would be using a substantial portion of the IPO proceeds to do so, a factfinder could presumably find that Qudian's offering materials were

misleading. *See, e.g.*, *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1291-92 (E.D. Wash. 2007) (denying a motion to dismiss where the company had disclosed that it might use the securities proceeds to service existing debt, but the plaintiff plausibly alleged that the company actually intended to use the proceeds for that purpose, explaining that "to suggest that an event is a possibility when it is, in fact, a certainty is necessarily misleading"). Although the question is a close one, drawing all inferences in Plaintiffs' favor, the Court concludes from the totality of the facts alleged in the Complaint, *see* SAC ¶¶ 9, 120-32, that Plaintiffs plausibly allege that Qudian knew or should have known that it would use the proceeds to fund Dabai Auto at the time of the IPO and, therefore, that they plausibly state claims under this theory.[6]

## F. Claims Against Diana Arias

Before concluding, the Court briefly address two separate arguments pressed by individual Defendant Diana Arias: that the claims against her should be dismissed because she signed the Registration Statement "*only* in her professional capacity as 'Senior Manager' at Law Debenture Corporate Services Inc.," ECF No. 145, at 1, and that the Section 12(a)(2) claim against her should be dismissed because she was not a "statutory seller subject to Section

---

[6] Defendants argue that Plaintiffs' allegations are "deficient as a matter of law" because they rely "solely on post-IPO developments." *See* ECF No. 165, at 6. But the cases cited by Defendants, such as *In re Jumei International Holding Limited Securities Litigation*, do not support such a categorical rule. Surely if Qudian had announced the opening of Dabai Auto (and its investment) the day after the IPO, a factfinder could conclude that the company misled investors by not disclosing those plans in its offering materials. That is, while "knowledge on day-120 does not mean Defendants 'knew' or 'must have known' on day-1," *Medina v. Tremor Video, Inc.*, No 13-CV-8364 (PAC), 2015 WL 1000011, at *3 (S.D.N.Y. March 5, 2015), *cited favorably in Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *4, knowledge on "day-2" arguably would support an inference of knowledge on "day-1." The allegations here fall somewhere in the middle of the spectrum. But drawing all reasonable inferences in Plaintiffs' favor, the Court concludes, from the timing and scale of the opening of Dabai Auto, that Plaintiffs' allegations of knowledge on "day-1" here are plausible enough to survive Defendants' motion to dismiss.

12(a)(2) liability," *id.* at 2.  Those arguments may prove to be valid, but they turn on issues beyond the scope of this motion and thus are rejected here, substantially for the reasons stated in Plaintiffs' opposition to Arias's submissions.  *See* ECF No. 157, at 2-6.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  That is, the Court concludes that, except as they relate to Dabai Auto, Plaintiffs' claims under Section 11 and 12(a)(2) fail as a matter of law.[7]  It follows that their Section 15 claims are dismissed to the same extent.  *See, e.g.*, *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (noting that a plaintiff must establish "an underlying violation of Section 11 (or Section 12(a)(2))" in order "to establish a *prima facie* Section 15 claim").  That leaves only the question of whether Plaintiffs should be permitted to replead their claims to the extent they have been dismissed.  Opp'n 35 n.36 (requesting leave to replead "[i]f any part of the Complaint is dismissed").  Given the disclosures in the offering materials discussed above, the Court is skeptical that Plaintiffs can cure the defects that it has found in their claims and, thus, would likely be on firm ground denying leave to amend.  *See, e.g.*, *Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("[I]t is proper to deny leave to replead where . . . amendment would be futile.").  Out of an abundance of caution, however,

---

[7]   Accordingly, the Court need not and does not reach Defendants' alternative argument concerning negative causation (which does not apply as to Dabai Auto).  ECF No. 143, at 28-29.  Nor need the Court spill additional ink on Plaintiffs' alternative argument that Defendants are liable under Sections 11 and 12(a)(2) because they failed to disclose material facts that they had a duty to disclose.  Putting aside the question of whether a plaintiff can bring both affirmative misrepresentation and omission claims on the same theory, Plaintiffs' omission claims survive as to Dabai Auto for the reasons discussed above and fail as to the other matters since, as discussed above, Defendants' disclosures were adequate.

18

the Court will grant Plaintiffs leave to amend once more. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).[8]

The parties shall, no later than **October 10, 2019**, confer and submit a proposed stipulation setting forth deadlines for the filing of any amended complaint and any answers or motions with respect to the SAC or an amended complaint (including any answers or motions by "New Defendants" as that term is used in the Stipulation and Scheduling Order at ECF No. 183).

The Clerk of Court is directed to terminate ECF Nos. 142, 159, and 169.

SO ORDERED.

Dated: September 27, 2019
New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[8] If Plaintiffs file an amended complaint, they shall submit certified translations of any Chinese documents on which they rely so that the Court may review, in full, any document that it finds has been incorporated by reference into the amended pleading.